Shelton Lynn ORINGDERFF, Appellant

v.

The STATE of Texas, Appellee

No. 06-16-00085-CR

Court of Appeals of Texas, Texarkana.

Date Submitted: December 27, 2016

Date Decided: April 24, 2017

Jason A. Duff, Attorney at Law, PO Box 11, Greenville, TX 75403, for appellant.

Joseph T. O'Neill, Assistant District Attorney, PO Box 441, Greenville, TX 75403, for appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Burgess

Shelton Lynn Oringderff was convicted of the offense of felony driving while intoxicated (DWI) in violation of Sections 49.04 and 49.09(b) of the Texas Penal Code and was sentenced to fifty years' incarceration. On appeal, Oringderff claims that the trial court erred in overruling his motion to suppress evidence and that the remaining evidence was insufficient to support his conviction. We overrule both points of error and affirm the trial court's judgment.

## I. The Trial Court Did Not Err in Denying Oringderff's Motion to Suppress Evidence

### A. Factual And Procedural History

Oringderff moved the trial court to suppress evidence obtained as a result of a traffic stop by Texas Department of Public Safety (TDPS) Trooper Damon Williams. In his motion to suppress, Oringderff alleged that Williams "did not have probable cause to stop [him and that] the stop and all evidence obtained from it were ... illegal under the [F]ourth [A]mendment [to] the U[nited] S[tates] Constitution and [A]rticle 1, [S]ection 9 of the Texas Constitution."[1] The trial court set Oringderff's motion to suppress for hearing on at least one occasion, but the motion was not argued on that or any other date. Rather, during the course of a pretrial conference where the parties and the trial court discussed possible dates for a suppression hearing, Oringderff's counsel stated that he was ready to hear the trial court's ruling on the motion to suppress if the court had made a decision.

In response to Oringderff's statement, the trial court informed the parties that it had reviewed (1) an audio recording of a 911 call alerting law enforcement to the possibility of a drunk driver and (2) an audio/video recording of Oringderff's traffic stop captured by the dashboard camera (dash cam) in Williams' patrol car. The trial court asked if either party had any additional evidence to present on the suppression issue, and both parties said that they did not. At that point, the trial court denied Oringderff's motion to suppress.

### B. Applicable Law and Standard of Review

A traffic stop constitutes a Fourth Amendment seizure, and reasonable suspicion is required to conduct such a stop. *See Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see also Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). As the Texas Court of Criminal Appeals has noted,

A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be

---

1. *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 10.

engaged in criminal activity. This standard is an objective one that disregards the actual subjective intent of the arresting officer and looks, instead, to whether there was an objectively justifiable basis for the detention. It also looks to the totality of the circumstances; those circumstances may all seem innocent enough in isolation, but if they combine to reasonably suggest the imminence of criminal conduct, an investigative detention is justified.

*Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (footnotes omitted). The United States Supreme Court has also held that

"reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard takes into account "the totality of the circumstances—the whole picture." [*United States v.*] *Cortez*, [449 U.S. 411, 147, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)]. Although a mere " 'hunch' " does not create reasonable suspicion, *Terry* [*v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)], the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

*Navarette v. California*, —— U.S. ——, 134 S.Ct. 1683, 1687, 188 L.Ed.2d 680 (2014). ▮▮▮▮ On appeal of a trial court's ruling on a motion to suppress, we apply the "abuse of discretion [standard of review], affording almost total deference to the tri-

al court's determination of historical facts that the record supports, especially when based on an evaluation of the witness's credibility and demeanor." *Dossett v. State*, 216 S.W.3d 7, 23 (Tex. App.—San Antonio 2006, pet. ref'd) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). Where the trial court does not issue findings of fact, we "view the evidence in the light most favorable to the judge's ruling and assume the judge made implicit findings of fact that support the ruling as the record supports those findings." *Cole v. State*, 490 S.W.3d 918, 922 (Tex. Crim. App. 2016). We may uphold a trial court's ruling on any legal theory or basis applicable to the case, but usually may not reverse a trial court's ruling on a theory or basis that was not raised in the trial court, even if it might have been applicable to the case. *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002).

In this case, the trial court did not conduct a formal hearing on the motion to suppress, and the suppression issue was not re-litigated at trial. Therefore, we will only consider the evidence before the trial court at the time of its ruling on the motion to suppress.[2] *See* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005); *see also Black v. State*, 362 S.W.3d 626, 635–36 (Tex. Crim. App. 2012) (holding that the general rule "[i]n cases in which the trial court is never asked, or is asked but declines, to exercise its discretionary authority to reopen the suppression hearing" is that "appellate review of [the trial court's] ruling on the motion to suppress is ordinarily limited to that evidence presented at the pretrial hearing—the evidence that was before the court at the time of its decision.").

---

**2.** A DVD containing an audio recording of the 911 call was admitted at trial as State's Exhibit 1, and a DVD containing an audio/video recording of the dash-cam video was admitted at trial as State's Exhibit 2A.

## C. Analysis

The evidence before the trial court at the time of its decision denying Oringderff's motion to suppress evidence established that Trooper Williams was dispatched to the area as a result of a 911 call informing the dispatcher that the caller believed he was following a drunk driver on State Highway 34. The caller informed the dispatcher that the vehicle he was following had "been weaving on both sides of the road." The caller provided his physical location and the license plate number of the suspected drunk driver's vehicle and described the vehicle as being maroon in color. The dispatcher then connected the caller to Trooper Williams. The caller repeated the information he had previously provided to the dispatcher to Trooper Williams. Shortly thereafter, Trooper Williams told the caller that the call was "breaking up" and asked the caller to provide his telephone number. The caller can be heard saying "903," and then the recording ended. The appellate record contains no other identifying information for the 911 caller.

Trooper Williams' dash-cam recording depicts Oringderff's vehicle moving along the highway directly in front of the trooper's vehicle. At the 00:32 point on the dash-cam recording, Oringderff's vehicle can be seen crossing the white line that separates the driving lane from the highway shoulder—the fog line—and then re-entering the right-hand lane of travel. At that point on the recording, Trooper Williams' overhead lights begin flashing, and shortly after that, Oringderff can be seen pulling his vehicle completely onto the shoulder of the highway.[3]

"It has been widely recognized that the reliability of a citizen-informant is generally shown by the very nature of the circumstances under which the incriminating information became known to him or her." *Brother v. State*, 166 S.W.3d 255, 258 (Tex. Crim. App. 2005). A law enforcement officer may consider information from a private citizen that he or she witnessed a crime, but the officer should also "have some indicia that the citizen is worthy of belief ... and his information [is] reliable before acting on a report." *Webb v. State*, 760 S.W.2d 263, 274 (Tex. Crim. App. 1988) (quoting *Earley v. State*, 635 S.W.2d 528, 532 (Tex. Crim. App. [Panel Op.] 1982)). "Unsolicited information regarding a crime in progress provided by a citizen who has no relationship with the police, provides detailed information, and makes himself accountable by providing contact information is sufficiently reliable to warrant an officer to reasonably conclude that a temporary detention is justified." *Martinez v. State*, 261 S.W.3d 773, 776 (Tex. App.—Amarillo 2008, pet. ref'd) (citing *Brother*, 166 S.W.3d at 258–59). Moreover, "the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists,'" and "[a] 911 police dispatcher is ordinarily regarded as a 'cooperating officer' for purposes of making this determination." *Derichsweiler*, 348 S.W.3d at 914.

In *Navarette*, the United States Supreme Court examined the boundaries of Fourth Amendment traffic stops based on 911 calls from anonymous callers. *Navar-*

---

3. Because no testimony was presented establishing the source of the recording or any additional contact with the 911 caller, and because the trial court did not enter any find-ings of fact, we must presume that the trial court found a sufficient basis for the trooper's warrantless traffic stop.

*ette v. California*, —— U.S. ——, 134 S.Ct. 1683, 1686, 188 L.Ed.2d 680 (2014). In that case, a police dispatcher "relayed a tip from a 911 caller" that a vehicle heading "southbound [on] Highway 1 at mile marker 88" described as a "Silver Ford F150 pickup" with a license plate number "8-David-94925" had just "[run] the reporting party off the roadway and was last seen approximately five [minutes] ago." *Id.* at 1686–87. Officers responding to the dispatch stopped the truck identified by the 911 caller at mile marker 69, smelled marihuana as they approached the truck, searched the truck, and found thirty pounds of marihuana. *Id.* at 1687. "The officers arrested the driver, petitioner Lorenzo Prado Navarette, and the passenger, petitioner José Prado Navarette." *Id.* The "[p]etitioners moved to suppress the evidence, arguing that the traffic stop violated the Fourth Amendment because the officer lacked reasonable suspicion of criminal activity." *Id.* The magistrate and the California Superior Court judge denied petitioners' motions, and the California Court of Appeals affirmed. The California Supreme Court denied review, and the Supreme Court granted certiorari. *Id.*

In affirming the California Court of Appeals, the Supreme Court noted that the 911 caller was anonymous and that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id.* at 1688 (quoting *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). Yet, the Supreme Court also recognized that "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Id.* In particular, the Supreme Court noted that in its previous decision in *Alabama v. White* it had

held that the officers' corroboration of certain details made the anonymous tip

sufficiently reliable to create reasonable suspicion of criminal activity. By accurately predicting future behavior, the tipster demonstrated "a special familiarity with respondent's affairs," which in turn implied that the tipster had "access to reliable information about that individual's illegal activities." *Id.* at 332, 110 S.Ct. 2412. We also recognized that an informant who is proved to tell the truth about some things is more likely to tell the truth about other things, "including the claim that the object of the tip is engaged in criminal activity." *Id.* at 331, 110 S.Ct. 2412 (citing *Illinois v. Gates*, 462 U.S. 213, 244, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

*Navarette*, 134 S.Ct. at 1688.

Using this framework, the Supreme Court observed several facts that indicated the officers had reasonable suspicion to stop petitioners' vehicles under the totality of the circumstances. First, given the detailed description of the vehicle and the 911 caller's claim that it ran her off the road, "the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving," and "[t]hat basis of knowledge lends significant support to the tip's reliability." *Id.* at 1689. Second, the officers located the vehicle in question "19 highway miles south of the location reported in the 911 call" at "roughly 18 minutes after the 911 call," which corroborated the 911 caller's information. *Id.* Third, the caller's use of the 911 system to report the driver made the information more reliable because "911 calls can be recorded, which provides victims with an opportunity to identify [a] false tipster's voice and subject him to prosecution." *Id.* at 1689–90. Finally, the Supreme Court noted that "the behavior alleged by the 911 caller, 'viewed from the standpoint of an objectively reasonable police officer, amount[s] to reasonable suspicion' of drunk driving." *Id.* at

1690 (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).[4]

■■■ Virtually all of the factors relied upon by the Supreme Court in finding reasonable suspicion to instigate the traffic stop in *Navarette* are present here. First, the anonymous caller used the 911 system to report the conduct. Second, the 911 caller described his location, described the vehicle, and reported the vehicle's license plate number.[5] Third, the 911 caller reported that the vehicle in question had "been weaving on both sides of the road," which the Supreme Court noted is "dangerous behavior[ ] . . . strongly correlated with drunk driving." *Id.* at 1690–91. Fourth, Trooper Williams followed Oringderff's vehicle, and the dash-cam video depicts the vehicle swerve over the fog line before Oringderff was stopped, which corroborated the information provided by the 911 caller.[6] Finally, by drifting over the fog line, Oringderff arguably committed a traffic offense in Williams' view.[7] Consequently, based on the totality of the circumstances as presented and reviewed by the

4. In connection with this last fact, the Supreme Court noted that in prior cases from several jurisdictions, descriptions that a driver was "weaving all over the roadway," "cross[ing] over the center line" on a highway and "almost caus[ing] several head-on collisions," and "driving 'all over the road' and 'weaving back and forth' " "are strongly correlated with drunk driving" and concluded that "a reliable tip alleging the dangerous behaviors discussed above generally would justify a traffic stop on suspicion of drunk driving." *Navarette*, 134 S.Ct. at 1690–91 (citations omitted).

5. Although the dash-cam video does not depict the license plate of Oringderff's vehicle sufficiently to reveal its number, Trooper Williams followed Oringderff's vehicle based on the description given by the 911 caller and stopped it when it veered over the fog line. Oringderff did not claim that his vehicle's license plate number was different than that provided by the 911 caller.

6. It is also worth noting that in *Navarette*, the officers followed the petitioners' vehicle for five minutes, and

> [Petitioner] Lorenzo's driving was irreproachable. . . . And not only was the driving *irreproachable*, but the State offers no evidence to suggest that the petitioners even did anything suspicious, such as suddenly slowing down, pulling off to the side of the road, or turning somewhere to see whether they were being followed.

*Id.* at 1696 (Scalia, J., dissenting). Moreover, "the crime supposedly suggested by the tip was ongoing intoxicated driving," but that when the officers stopped the vehicle, they determined the petitioners were not intoxicated. *Id.* In fact, the petitioners in *Navarette* were not arrested for DWI, but for "transportation of marijuana and possession of marijuana for sale." *People v. Navarette*, No. A132353, 2012 WL 4842651, at *1 (Cal. App. Oct. 12, 2012). Consequently, the facts justifying reasonable suspicion in the present case are even stronger in some respects than the facts in *Navarette*, because here the dash-cam video reveals Oringderff driving over the fog line before Trooper Williams stopped him, and when stopped, Oringderff was arrested, charged, and convicted of DWI, which was the crime suggested by the 911 caller's information.

7. Williams did not testify at the suppression hearing, and he cannot be heard on the dash-cam video identifying a specific statute that he believed Oringderff violated. However, the Court of Criminal Appeals has recently held that a violation of Section 545.060 of the Transportation Code occurs when either the driver "changes marked lanes when it is unsafe to do so," or "fail[s] to remain entirely within a marked lane of traffic so long as it remains practical to do so, regardless of whether the deviation from the marked lane is, under the circumstances, unsafe." *Leming v. State*, 493 S.W.3d 552, 559–60 (Tex. Crim. App. 2016) (interpreting Tex. Transp. Code Ann. § 545.060 (West 2011)). Additionally, Section 545.058 prohibits driving on the improved shoulder except in certain enumerated circumstances. Tex. Transp. Code Ann. § 545.058 (West 2011). Therefore, the dash-cam video arguably depicts a traffic violation committed in Trooper Williams' presence.

trial court, we find that the trial court did not abuse its discretion in denying Oringderff's motion to suppress evidence.

## II. Sufficient Evidence Supports Oringderff's Conviction

### A. Standard of Review

 In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917-18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

 Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized

by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

### B. Summary of the Evidence

The State's sole witness at trial was Trooper Williams. Williams testified that he was notified by dispatch that a citizen called to report a potential drunk driver. At the time he received this information from dispatch, Williams was already patrolling State Highway 34, the road upon which the 911 caller claimed to be following the alleged drunk driver. Williams found a car matching the 911 caller's description and followed it. According to Williams' trial testimony, while following the vehicle, he observed the car "swerving in between his lane." However, Williams testified that because he did not believe that to be a violation of the law, he did not initiate a traffic stop based on that conduct. Rather, upon seeing the car "swerve . . . onto the shoulder," he immediately initiated a traffic stop because "[t]hat's a violation. You can't drive on the improved shoulder." [8]

Williams also testified that after he stopped Oringderff's vehicle, he smelled alcohol coming from Oringderff. Oringderff originally denied that he had consumed any alcohol, but later said he had consumed two drinks of whiskey four hours before being stopped. When Williams asked him to exit the vehicle, Oringderff complied. Williams administered the horizontal gaze nystagmus (HGN) test and observed six indicators of intoxication. Williams also noticed Oringderff sway during the HGN test. [9]

---

8. *See supra* note 7.

9. Oringderff can also be observed swaying on the dash-cam video. He claimed to have a bad

knee and bad back, which could account for the swaying, but the jury could also reasonably have concluded that the swaying depict-

Because Oringderff said he had a bad knee, Williams decided to administer the finger-count and ABC field sobriety tests rather than the standardized one-leg stand and walk-and-turn tests. During the finger-count test, Williams instructed Oringderff to extend one arm in front of him with his palm facing forward. He further instructed Oringderff to use the top of his thumb to touch his remaining fingers while he counted each time his fingers and thumb connected. Williams instructed Oringderff to complete the finger-count exercise three times, but Oringderff only performed the exercise twice.

In administering the ABC sobriety test, Williams instructed Oringderff to recite the alphabet. When he did, Oringderff omitted the letters "g" and "i" and all letters following "o." Williams testified that he arrested Oringderff because of his performance on the HGN, the finger-count, and the ABC sobriety tests and because he smelled alcohol coming from Oringderff. Both Oringderff's performance of the finger-count and ABC field sobriety tests are observable on the dash-cam video

of the traffic stop. When he arrested Oringderff for driving while intoxicated, Williams said he believed Oringderff had lost the mental and physical ability to drive because he had had too much to drink that evening.

## C. Analysis

The State alleged in its indictment that "on or about the 4th day of July 2013, A.D., Shelton Lynn Oringderff did then and there operate a motor vehicle in a public place while intoxicated by reason of the introduction of alcohol into the body...." Section 49.04(a) of the Penal Code states that "a person commits an offense if the person is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04 (West Supp. 2016). The term "intoxicated" is defined as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol ... into the body...." TEX. PENAL CODE ANN. § 49.01(2)(A) (West 2011). The evidence in the present case is similar to the evidence that was found to be sufficient in other cases.[10] Accordingly, the record supports

---

ed on the dash-cam video was related to intoxication instead.

**10.** In *Gordon v. State*, we found the evidence sufficient to support the defendant's conviction for driving while intoxicated where the evidence showed, in part, that the arresting officer witnessed the defendant's truck "weave several times and fail to stay within its lane" and "smelled a strong scent of alcohol on [the defendant]" and that the defendant failed "field sobriety tests administered at the scene." *Gordon v. State*, 161 S.W.3d 188 (Tex. App.—Texarkana 2005, no pet.); *see also Compton v. State*, 120 S.W.3d 375, 380 (Tex. App.—Texarkana 2003, pet. ref'd) (finding sufficient evidence to support defendant's conviction for driving while intoxicated where defendant admitted drinking two beers, arresting officer testified he noticed defendant's "slurred speech and the smell of alcohol on his breath," defendant failed the field sobriety tests, and the dash-cam video supported the

officer's testimony); *Gerron v. State*, 119 S.W.3d 371, 375 (Tex. App.—Waco 2003, no pet.) (finding that evidence was sufficient to support the defendant's conviction for driving while intoxicated based, in part, upon evidence that the defendant "was 'weaving' in and out of marked lanes and drove on the shoulder when he exited the interstate," the arresting officer "smelled alcohol on [the defendant]," the defendant "swayed in his seat and had trouble opening the window," and the defendant failed three field sobriety tests); *Paschall v. State*, 285 S.W.3d 166 (Tex. App.—Fort Worth 2009, pet. ref'd) (finding evidence was sufficient to support defendant's conviction for driving while intoxicated where there was "eyewitness testimony regarding [defendant's] driving," the arresting officer testified defendant failed field sobriety tests, video was introduced showing defendant "performing the field sobriety tests," and arresting officer testified that defendant "did not have the normal use of his mental or physical faculties").

the jury's finding of guilt beyond a reasonable doubt. We overrule Oringderff's second point of error.

## III. Conclusion

We affirm the trial court's judgment.